EDWARD MEYERS

*vs.*

CITY OF HARTFORD ET AL.

Superior Court          Hartford County          File No. 62028

MEMORANDUM FILED DECEMBER 2, 1940.

*Hogan & Shea,* of Hartford, for the Plaintiff.

*Vincent W. Dennis,* Corporation Counsel; *Harold Borden,* Assistant Corporation Counsel; *Warren Maxwell,* and *Richard H. Deming,* all of Hartford, for the Defendants.

McEVOY, J.   The plaintiff is a licensed airplane pilot.   He has brought this action in two counts.

In the first count he seeks to recover damages for injuries alleged to have been caused to his airplane and to his person by the failure of the defendant city and its manager to reason-ably supervise, maintain and operate an airport known as Brainard Field, in the City of Hartford, in one or more of the following particulars:

a.  In violating Federal, State and local air regulations governing the provision and maintenance of proper wind indicating devices at Brainard Field;

b.  In failing to provide a uniform or any traffic con-trol for planes using said field under the existing condi-tions;

c.  In maintaining a public landing field without ade-quate wind indicating devices;

d.  In failing to repair its defective landing tee or pro-vide other such equipment in good working order;

e.  In permitting an elevated power line obstruction at

the northwest end of said field rendering taking off and landing extremely hazardous;

f. In failing to give proper wind direction instructions or information to pilots;

g. In that by reason of its negligence in the management of its field equipment, confusion resulted in the approaching and landing of planes;

h. In failing to set said tee properly on the day of said accident;

i. In failing to maintain the basic requirements of an airport.

In the second count, he seeks recovery upon the theory that the defendants created and permitted a nuisance to exist because of:

a. The absence of proper wind indicators;

b. The absence of a defective and unreliable wind tee, the absence of a wind sock, and the presence of high-powered wires at one end of said field;

c. The absence of any traffic control, either electrical, mechanical, or personal, to warn and guide pilots in landing upon and taking off from said field.

As to all of the allegations the defendants have pleaded either no knowledge or information sufficient to form a belief or a denial.

In addition to this, the defendants have pleaded that the plaintiff "voluntarily assumed the risk of injury associated with his use of Brainard Field as a landing field by virtue of his prior knowledge of the weather conditions then and there prevailing, the visibility, the character of the surface of said Field at said time and place, and the character and condition of the instrumentalities and facilities maintained at said Field."

On or about February 19, 1939, there were approximately 2,700 airports in the United States. Of these about 50 had full air traffic control. About four or five hundred of the airports were in the classification of Brainard Field and the remainder were, more or less, in the emergency type of field or the field without much, if any, control.

There are different types of controlled airports. There are

terminal airports; some with radio controlled traffic and some with traffic light control. There are other airports in a high stage of development which are controlled simply by regulation. Then there are still other types of airport, the privately owned type of airport, supervised in some degree by the owner or the operator of the airport. There are other types of airport known as emergency fields which usually have no supervision or control.

Brainard Field is controlled only by regulation, that is, by ordinances and rules.

On a flying field such as Brainard Field the chief and ultimate guide and control is through the instrumentality of the wind tee.

Local ordinances, State laws and Federal rules, regulations and laws are applicable to and govern the actions and conduct of those in charge of Brainard Field and the pilots who use it.

While there seems to be a conflict as to some of these various ordinances, rules, regulations and laws, there is one rule as to which these litigants seem to be in accord.

That rule is that all pilots, in taking off and in landing their planes, are required to follow the direction as indicated by the wind tee and that, when there is no wind, or when the wind is of less velocity than five miles an hour, their airplanes shall land and take off in the direction as shown by the landing tee—which is the wind tee.

A wind tee is supposed to point into the wind and it seems to be a fairly hard and fast rule that the direction, as indicated by the wind tee, must be followed by all pilots in taking off and in landing.

A wind tee is a navigation aid. Its function is to assist the pilot in ascertaining the wind direction. No wind tee is 100% accurate under all conditions since it is dependent upon and governed by weather conditions.

Primarily it is a mechanical device. The wind may vary in different parts of an airport, due to changes in temperature or due to obstacles and surroundings near the wind tee in relation to draft.

That it may function efficiently it is preferable to design it so that it will return automatically to the "no wind" land-

ing direction when the wind velocity drops below five miles per hour and it should be so constructed and mounted as to fly freely with the wind.

In case it is not visible to aircraft approaching from any direction, such additional wind indicator should be installed as may be necessary under the circumstances.

If the wind fluctuates and is of sufficient strength the tee may very well be blown or actuated by the wind so as to point in different directions almost simultaneously.

In a wind below four or five miles per hour the wind tee seldom moves and usually remains stationary.

It is for that reason that the rule contains the provision that the wind tee shall be so mounted as to fly freely with the wind.

The natural result of this construction would be that, in a wind of five miles per hour or less, the wind tee would remain in the position in which it was left by the declining wind.

The governing rules also provide that the wind tee shall give a true indication of the direction of the wind on the landing area and that it shall be readily visible to all aircraft approaching the port from any direction.

There are many factors which may affect the flow of the wind—obstructions adjacent to a wind indicator; changes in temperature; warm air which may arise from the hard surfaced areas which constitute the runways; cool air which may arise from the damp grass, or from the ground, and other atmospheric and structural conditions.

A "smoke-pot", placed partly under the ground surface, is a more nearly accurate wind indicator than any other known wind device, but, for obvious reasons, the use of a "smoke-pot" is not always feasible.

Variable wind readings and indications occur at varying altitudes. For that reason, the practice of placing wind indicators on high buildings has been discontinued, since the real purpose is to indicate the wind direction at ground level, where the planes take off or land.

Section 75 (b) of the Federal Air Commerce Regulations,.

which apply to all aircraft in flight, requires that aircraft in circling a landing area for any purpose, if flying within 3,000 feet horizontally of the nearest point of the landing area, shall circle to the left (counter-clockwise) unless otherwise specified by the Secretary of Commerce of the United States and unless flying at a height in excess of 2,000 feet.

Counter-clockwise (left) turns prevail at the majority of airports in this country. In a few instances, however, local conditions may require that the direction of turn be established as clockwise, as distinguished from counter-clockwise.

If other than counter-clockwise turns are to be made it is necessary to obtain authorization from the Secretary of Commerce of the United States.

In such cases it is usually provided that the airport shall display suitable markings to indicate the direction of turn in accordance with the following requirements: If clockwise (right) turns are to be made at all times, the letter "R" shall be displayed in the center of the landing area, mark or circle, and in case the airport is lighted for night operations, the letter "R" shall also be displayed upon the roof of an outstanding airport building or another suitable area and shall be illuminated every night from sunset until sunrise with exposed incandescent lamps or other equivalent apparatus, in accordance with the provisions of Part (e), section 75, and shall be so arranged that either the "R" or "L" may be displayed, depending upon the direction of the turn.

Section 60.3302 of the Civil Air Regulations provides that: Aircraft approaching for a landing shall circle the airport or other landing area sufficiently to observe other traffic, unless the pilot receives other instructions from the airport traffic control operator, and that such circle shall be made to the left.

This is the usual procedure, except that, in some local emergency where conditions might warrant circling to the right, it is within the control of the airport control manager to orally give an order authorizing a right turn.

No authorization had been obtained for any alteration of the turning rule as to Brainard Field and, on and prior to the day in question, the provisions of section 75(b), as to counter-clockwise turns, were known by all users of this airport

to be, and they were, in force and effect and they bound all users of Brainard Field on that day.

A right turn is seldom permitted within 1,000 feet of an airport.

A left turn is more practicable and easier to make and is, naturally, to be expected over and about an airport.

On the day of this incident no direction for right turns had been given to any users of this airport.

On and prior to Sunday, February 19, 1939, the plaintiff was a limited commercial pilot. This status gave him the privilege of carrying passengers for hire within a ten-mile radius of Brainard Field, at Hartford, Connecticut.

At that time the plaintiff had completed the written test for a commercial license. A commercial license is one step higher than the limited commercial license. The full commercial license would give the plaintiff the right to carry passengers for hire anywhere in the United States.

Up to that day the plaintiff had about 365 flying hours experience.

An experience of 200 flying hours was required for the attaining of a commercial license.

On that day the plaintiff was the owner of a two-seated Aeronca Model K monoplane — Federal license number NC18813.

For some time prior to that date, the plaintiff had housed his plane at the hangar of the Aviation Service Company at Brainard Field, for which storage he paid $20 per month.

Under these conditions the plaintiff, as a pilot, was entitled to the use of Brainard Field on the day in question.

For about four years prior to this date the plaintiff was employed as a grocery clerk and it was his custom to take his friends and customers up in his plane and to give them rides.

While carrying them in his plane it was his custom "to bank the plane a little bit", which led the customers and friends to believe that they were "doing a lot of stunts", and according to the plaintiff's own version of the matter he had, before February 19, 1939, given away thousands of such rides.

February 19, 1939, was a comparatively warm day and at about noon, on that day, the temperature was about 60 degrees.

On that day the flying field, as distinguished from the runways, was more or less coated with water, some mud and a little ice.

This was the conventional, or usual, condition which was to be expected on such a day and which usually existed throughout the winter months.

When the plaintiff took off that day from Brainard Field, at about 12 o'clock noon, he piloted his plane above Brainard Field and had a gratuitous passenger.

At that time the sky was very hazy and there was a good deal of haze over the city and the visibility was poor and the weather was "foggy and thick."

The plaintiff's plane was not equipped with any radio sending or receiving signal.

This was true at all times between 9 o'clock and 12 o'clock noon on Sunday, February 19, 1939.

At no time during his flight that morning did the plaintiff pay any attention to the wind because there was not enough wind to be perceptible and it had no effect upon the action of the ship which the plaintiff was flying.

Under the general conditions then prevailing, it was somewhat hazardous for anyone to fly over Brainard Field in a plane not equipped with radio signals.

At practically all times during that morning the wind tee pointed in a southwesterly direction.

The direction of the wind tee was known to the plaintiff at all times during that morning.

After the plaintiff took off he flew around and over Brainard Field for about 15 to 30 minutes.

The purpose of this flight was, in the plaintiff's words, "to kill time" and, apparently, to entertain his passenger.

During this flight there was only one other plane in the air over Brainard Field and that was owned and operated by Avard E. Fuller.

During the circuit of the field the plaintiff, for some un-explained reason, remained in close proximity to the Fuller plane.

Whether this was intended as part of the entertainment of his passenger or whether it was merely incidental does not definitely appear.

Mr. Fuller circled his plane to the east and then northerly along the easterly edge of the field and, as he did so, it was apparent to and known by the plaintiff that Mr. Fuller in-tended to land upon the east-west runway which runs along the northerly edge of Brainard Field.

Pursuing this evident intention, Mr. Fuller circled to his left and evidenced his intention to land his plane on the run-way.

Under these circumstances it would have been reasonable for the plaintiff either to have remained at a reasonable dis-tance behind the Fuller plane or to have circled the field again before undertaking to land.

The plaintiff did neither but followed closely behind the Fuller plane and endeavored to land on the runway behind the Fuller plane.

The east-west runway was 100 feet wide and, approxi-mately, 3,300 feet long.

It would have been feasible, under normal conditions, for the plaintiff to have landed his plane on the runway within 100 feet and there was ample room on the runway, behind the Fuller plane, for the plaintiff to have landed his plane safely if he had elected to do so.

It was, and should have been, apparent to the plaintiff that he would assume an obvious risk if he followed too closely behind the Fuller plane when it was being landed and that the assumption of that risk by the plaintiff would create an emergency.

At or about the time when the Fuller plane landed on the runway it occurred to the plaintiff that Mr. Fuller might not keep his plane upon the runway and that it was then possible that he might "take off" into the air again.

At this juncture the plaintiff had begun to lower his plane toward the ground.

Realizing that, to pursue that course, would be to court danger, the plaintiff undertook to continue his flight and to attain a higher altitude so that he might pursue his course westward across the field, and then circle to his left southerly around the field before his own landing.

With this in mind the plaintiff "gave the gun" to his plane; then looked to his left, or behind him, in an endeavor to determine whether or not any plane was approaching from his rear.

Just about as the plaintiff completed these maneuvers and, as his plane began to attain altitude, he then, for the first time, observed a large plane rapidly approaching him from, approximately, the opposite direction—the west.

Fearing that a collision was imminent if each plane pursued its then course, the plaintiff abruptly turned to his right—the north.

At that time the plaintiff's altitude was less than that of the approaching plane and it is probable that, actually, if each plane had pursued its then course each would have cleared the other safely.

A collision, however, appeared to the plaintiff to be imminent and, in order to avoid it, the plaintiff turned to his right. The other plane was turned to its left, that is, the plaintiff turned north, expecting that the other plane would turn south, so that the approaching plane came almost directly over the plaintiff's plane—the latter proceeding in a northeasterly direction.

The plaintiff turned to the north and then undertook to turn, abruptly, to the south, to plaintiff's left, pushing the front of his plane down so as to gain speed, but, as the plaintiff neared the ground, he "pulled back the stick" and there was no control of the ship and it violently struck the ground.

The plane which had been approaching the plaintiff continued its course, made a normal turn, circled the field, and landed safely.

By reason of the contact with the ground, the plaintiff's passenger was so seriously injured that he died within a short time, the plaintiff's plane was demolished and the plaintiff was seriously and permanently injured.

Before taking off that morning the plaintiff knew just what the flying conditions were and he understood that, if there were any risk attached to his flying in those conditions, he assumed that risk. He also appreciated the nature and extent of the existing risk.

No directions from any radio were being given at the time of the incident in question and, if such directions had been given, the plaintiff would have had no means of receiving the directions as his plane was not equipped with radio, nor were any directions being given from any tower at the time in question.

Prior to this landing, and in the course of his flight, the plaintiff had flown his plane over the "meadows" south of the field and, in doing so, practiced "shallow eights."

A "shallow eight" is not necessary to the normal flying of a plane. It is a practice maneuver which student pilots, either flying solo or with the instructor, do practice in order to perfect airmanship, but it is not a maneuver which is necessary to the normal flight of a plane.

Usually in the process of performing "eights", either shallow or vertical, the pilot deliberately selects two points at right angles to his wind, and considers them as pylons around which to make his "eight" and so as to be sure that, in the process, he is not "drifting."

Over a meadow such maneuver is made in the absence of and without the guidance of pylons.

On that day at and before the time the plaintiff was flying, he observed that the visibility was poor; that, in the sky, there were "scuds"; "bunches of clouds"; that everything had a "smoky appearance"; that, at times, one could see for approximately three miles but that, at other times, the visibility was very materially limited.

Although the visibility was poor and the conditions were as described on that day, the plaintiff, upon the trial, expressed himself as having felt that "as everyone else was flying I thought that the danger was so slight that it would be perfectly safe for me to fly around."

During the hurricane of September, 1938, the wind tee on Brainard Field was blown down and its shaft was bent.

The wind tee was equipped with a double row SKF self-aligning ball bearing, contained in a housing.

The "bend" was above the housing, in the longitudinal direction of the tee, so that the "bend" had no effect upon the operation of the tee.

The wind tee was red in color; it was conspicuous at the northwest corner of the field; the plaintiff had frequently observed the condition of the tee before February 19, 1939, because he had frequently "taxied" his plane near it.

As previously stated, the rule is that the wind tee is supposed to point into the wind and that is the direction in which the pilot is supposed to head his plane in making a landing or in taking off, and reliance is had upon the direction of the tee for that purpose.

At the time in question there was a smaller arrow on top of the wind tee. In a very light wind the arrow on top of the wind tee turns more readily and, perhaps more rapidly, than does the wind tee itself but the plaintiff and other flyers had previously relied upon the tee and had taken their directions from the tee proper and not from the small arrow which was on the top of the wind tee.

This was the only wind indicator on the field on February 19, 1939.

Previously there had been a wind sock upon the field but this had been injured and removed.

On the day in question, while the presence of a wind sock might have lent assistance to flyers in determining the wind velocity, as distinguished from the direction of the wind, yet the plaintiff, as well as other flyers who had previously and were then using the field, placed their reliance upon the direction of the wind tee and not upon any wind sock; nor were any of the flyers, including the plaintiff, prejudiced in their flying by the absence of the wind sock.

Before taking off, on the day in question, others had been flying for three hours in the neighborhood of the tee and, during that time, there had been about 15 "take-offs" and "landings", all of which were safely made.

At the time when the plaintiff undertook to land his plane,

and at all times during that morning, the landing field was in reasonably safe condition for landing or taking off and it would have been seasonable and reasonably safe for the plaintiff to have either landed or to have taken off on the landing field.

The plaintiff has not sustained the burden of proving, by a fair preponderance of the evidence, any of the material allegations of his complaint.

Nothing which the defendants, or either of them, did or failed to do, in any way contributed to or was a substantial factor in causing the injury to the plaintiff or to his plane.

The issues are found in favor of the defendants and judgment may be entered for them to recover their costs.